We will hear argument next this morning in Case 10-6, Global-Tech Appliances v. SEB S.A. Mr. Dunnegan? Mr. Chief Justice, and may it please the Court, the standard for the state-of-mind element for a claim for inducing patent infringement should be did the accused inducer have a purpose to induce a third party to engage in acts that the accused inducer knew to infringe the patent? That's what I'll call the purposeful culpable test. The Federal Circuit applied a standard of whether Pentalfa was deliberately indifferent to a known risk that a patent may exist. The Federal Circuit's deliberate indifference test was not a willful blindness test. Willful blindness would have required both an awareness of a high probability that a patent would exist and a deliberate effort to avoid learning the truth. And that's okay as far as you're concerned? You consider that comes within your first test? Your Honor, deliberate indifference would not fall. It would not, but willful blindness would? No, Your Honor. Willful blindness would not fall within our purposeful culpable test. So even willful blindness wouldn't be enough? Willful blindness is not a purpose, Your Honor. You said that the particular patent, the defendant would have to know that the device infringed the particular patent. I think that would be a standard that would be impossible to meet. We'd have to know if it was patent number, whatever it was, 312? Well, you wouldn't have to know the patent number, Your Honor. But what you would have to know is that the product, which you are inducing a third party to make use or sell, would be within the scope of the claims of a particular patent. If you don't know that, then you're literally just But you can keep yourself ignorant of it. I mean, for example, you pointed out that the device that was copied was purchased in Hong Kong, so it didn't have any marking. But the same pent-alpha could have bought the device in Montgomery Ward, looked to see if it had a patent marking. It didn't do that. It didn't do that, Your Honor. What it did was better. It hired a United States patent attorney to conduct a search to see if there was any patent which was infringed. But didn't tell that patent attorney that they had reverse-engineered a particular product. If the attorney had been told, this device copied the SEB Friar, isn't it 99, 100, 44, 100 percent sure that the attorney then would have found this patent? We don't know, Your Honor. We don't know why the patent search failed. It could have failed for a number of reasons. But I didn't ask you about this patent search. I said if they had told the patent attorney, we have copied a particular Friar. It's SEB's Friar. Now, find out if it infringed any patent. Do you think an attorney would not have found the SEB patent? It's possible that he wouldn't have. Maybe it's more probable that he would have. There's just no evidence on that in the record, Your Honor. Scalia, why wouldn't you tell him, if you're honestly interested in finding out whether there's a patent that you're infringing, why wouldn't you tell him, the reason we're concerned is that we have reverse-engineered this from somebody else's product. Just check to see if SEB has a patent on any of this stuff that was reverse-engineered. That's what I would have done. Your Honor, maybe that's what you have done, maybe that's what I would have done. But there's no – but the standard of that business, what they had done in the past, was to give their design drawings to the patent attorney and say, objectively check these design drawings. Their practice was not to notify the attorney. Scalia was their practice to reverse-engineer from other people's products? I mean, I can understand when you have a new product of your own, of course, you just give it to an attorney. But where you have reverse-engineered, not to tell him that it was reverse-engineered, seems to me really trying to keep yourself in the dark. What you want to get from the attorney is a piece of paper that he can show to Montgomery Ward that, yes, this product is not, as it turns out, Montgomery Ward did accept it and got hit with liability for infringing a patent. I find that really incredible, that in an honest attempt to find whether there was any patent infringement going on, you wouldn't even tell the patent attorney that you reverse-engineered somebody else's product. Your Honor, looking back at this in hindsight, there's no question that if they had to do it again, they would have taken the additional step. No, they wouldn't. No. Well, from an objective perspective, Your Honor, if you're giving the design to the attorney and you're saying do a complete search, it seems to me that that's the antithesis of being willful blind, because you're hiring a specialist to go out and look for the answer for you. Now, the gold standard was not met, but the gold standard will rarely be met in any of these cases. Alitoso, Your position is that even willful blindness isn't enough. You have to have actual knowledge that the item is patented, right? That is correct, Your Honor. So if the attorney had called up your client and said I have an answer for you, and the client said, well, you know what, on second thought, I really don't want to know, because if I have actual knowledge, that may put me in a box, so forget about it. Then there's no liability. Well, I would disagree in that situation, because most probably the knowledge of the attorney in that situation, because he's been hired by the client, would be imputed to the client. So I could see a different result in the hypothetical that you posited. Sotomayor, why would we – wouldn't the rule that you're setting forth, willful blindness, not being a part of it, mean that nobody would ever get a patent search? Because what would be the inducement to do that? Well, Your Honor, right now under the Seagate case in the Federal Circuit, there is no inducement to go get a patent search. Under the Seagate decision, if a party – Sotomayor, but you're not presumed to copy other people's items, which is the difference. Is there – let me just ask you something. Assuming we were to find a willful blindness test to actual knowledge, the facts of your case, the fact that they did not give the name of the product that they copied to their patent attorney, is that just as a matter of law, willful blindness? No, Your Honor. I don't think that's willful blindness as a matter of law. Willful blindness under the Santos standard has two distinct elements. One would be that there's a high probability that there would have been a patent on that particular product. Do patents – can you do a patent search on the basis of the name of the holder? Yes, you can, Your Honor. And the product that they copied, did it have the name of the holder of the patent? Yes, it did, Your Honor. So what is the likelihood that if they had actually given the attorney the name of the product, that he would not have found the patent? We don't know for sure, but the probability would be greater than 50 percent, Your Honor. I think it would be probably 90 percent, assuming because there's always errors in searches. Kennedy, but didn't we take this case to determine whether or not deliberate indifference is the standard? I mean, willful blindness, which I don't think an opinion for this Court has ever sustained, Santos was a judgment, it was not a majority opinion. That's just a subset of knowledge. If we leave that out, isn't the dichotomy that you present to us the difference between deliberate indifference and knowledge? Or purposeful, culpable expression than the Grokster standard? Yes. Well, I think to answer the question presented in a cert petition, you really need to determine what the standard is. Now, I think we can also decide that it should not be willful or we can agree that it should not be a deliberate indifference to a known risk that a patent exists, because that would be met in virtually every situation where there was not actual knowledge of a patent. And when I look at the language of the statute, I see no scienter requirement whatsoever. Whoever actively induces infringement of a patent. Infringement is strict liability. So if you actively induce somebody to engage in conduct constituting infringement, you're liable as an inducer. Let me explain to you why the language of the statute should not support the interpretation which Your Honor just gave. Let's begin with the word induces. Induces connotes some degree of intent, arguably. Mr. Cruz agrees with that at page 20 of his brief. If you put the word actively in front of the word induces, then you have a heightened intent standard. You have intent, but intent to do what? Exactly, Your Honor. That brings you to the word infringement in the statute. Now, I think it's critical that B uses the word infringement. It does not go back to A and say anyone who actively induces the making, using, selling of a patent device is an infringer. What difference does that make? Because making, using, and selling equals infringement. Because those are the acts, Your Honor. If Congress's intent had been to say we only want to induce acts, it would seem to me the clearest way they could say that is to say making, using, or selling. If they wanted to create a standard which was inducing the actual infringement of a patent, as opposed to the acts which constitute the infringement, then they used the word infringement. Alito, I don't see that. And not only that, I don't understand why the scienter requirement for inducing should be higher than the scienter requirement for a direct infringement. Isn't the standard rule for aiding and abetting that the aider and abetter, if B is an aiding and abetting provision, as one of the congressional reports said, that the scienter for aiding and abetting is the scienter of the underlying offense? So if the underlying offense is a strict liability offense, then the inducement should be strict liability as well. That's not necessarily clear, Your Honor. When you look at 18 U.S.C. section 2, there's very little case law dealing with strict liability offense and inducements of those. We have been able to identify one Sixth Circuit case from 1989 which deals with the issue, and in that case it holds that there's actually a purpose to cause the underlying crime or violation, not necessarily strict liability, not strict liability. Roberts, is your position when you're talking about willful blindness or purpose or whatever, is that with respect to a particular patent or is it with respect to infringement of a patent? I don't think it's true with deep friars, but in some areas you almost always know you're going to hit something. Given the nature of the industry, you're going to infringe something. Is that enough? If there's an area, for example, semiconductors, where some amici has stated that there's 720,000 patents dealing with semiconductors, and you know that, and you know that if you do virtually anything, and especially if you copy, you're going to hit a semiconductor patent owned by somebody, I think that in that rare situation, knowledge that you're infringing someone's intellectual property rights should probably be enough of an intent, of a directed intent. If you – that would be the basis for inferring a purpose. But here we have to. Roberts, I mean, I understand you're in the deep friar industry, but that standard would bring the semiconductor industry to a halt. No, no, Your Honor. If you copied a semiconductor and you knew that there were 420,000 patents that were unexpired out there, that would make it – if you didn't do your – your diligence. Roberts, I think the problem is even if you do do your diligence, given the way patents are these days, there are 420,000, you're never going to know with any degree of comfort that you're not going to infringe something. That's very, very true, Your Honor. And even in the deep friar industry, it's going to be different, because there's very few – I mean, compared to semiconductors. Scalia, we're not going to adopt a special rule for the deep friar industry. I mean, there's a degree of patent rule. Completely agree. But we might decide that it's more important to consider what's going to happen to the semiconductor industry in articulating our standard than what's going to happen to the deep friar industry. That's exactly correct, Your Honor. That's exactly correct. And on balance, I think there's one point that I should make sooner rather than later and it's the standard that I'm – the standard that we're proposing is not unique to us. It's the standard that Grokcer developed. And with respect to willful blindness, we believe that the standard – the balance was already struck and it was struck in favor of eliminating a willful blindness  I'd like to read what you said. Kagan, suppose I disagree with you on that, and suppose I think that actual knowledge of a patent or willful blindness as to whether a patent exists is the right standard. Could a reasonable jury have found that in this case? We don't think that a reasonable jury could have found willful blindness because, first of all, there wasn't the high probability that a patent would be found. Second, we don't think that there was active appeal. A reasonable jury couldn't have looked at the facts that Justice Ginsburg suggested. You know, you don't tell the lawyer that you in fact have copied the product and say that's a reasonable jury, that's willful blindness. I don't think so, Your Honor, because what we had done in that situation was, first, we have done more than the law required. We went out to get a patent. We gave the lawyer our actual patent drawings and tell him to do his work. But if you really wanted to know, wouldn't you have gone into Montgomery Ward and bought one of the friars and turned it around to see if it had a patent number on it? Your Honor, we have so many products that you couldn't practically expect the company to do that, I don't think. Well, listen, the reason you got the opinion from the lawyer was not to make sure that there were no patents. It was to show that opinion to Montgomery Ward. But Your Honor, I take issue with you for the following reason. I don't think there was any intention on the part of our client to infringe a patent at all, because if it knew about the patent, it could have designed around it if it knew what it was doing. There's no benefit to our client of getting Montgomery Ward or Sunbeam or Fingerhut in trouble for patenting infringement. We really want to know what patents are out there. Isn't it true that Sunbeam was the party that asked for the patent search? I don't believe that's in the record, Your Honor. I believe the record shows that Sunbeam was given a copy of the patent search, but Mr. Sham testified, and I believe this is about at page 50 of the joint appendix, that the purpose of the search was to find out whether or not there was an infringement of any patent through this deep fryer. And there's nothing in the record that says who asked Pendalfa to get a letter? If this isn't willful blindness, I don't know what willful blindness is. Now, maybe you can explain what more would have been required to permit a reasonable jury to find willful blindness. Okay. I think you'd need two things, Your Honor. The first that you would need is evidence that they were going to bump into a patent if they proceed it. Is there the high probability of finding a patent? Now, if you just consciously avoid knowledge in the absence of a high probability, that's not willful blindness. That's not even helpful. Alito, your client, I don't know whether you're using your time most effectively by arguing this point, but your client thought that making a deep fryer that wouldn't burn people's hands if they touched it would be profitable, because there wasn't a lot of competition in that market. This was a useful product and apparently one that was different from other deep fryers. Isn't that in itself, doesn't that in itself suggest, gee, there might be a patent on this? One company is making this and it seems to be better than what the other companies are making. Maybe it might be patented. Your Honor, the record is that there were six or so deep fryers which were the cool touch deep fryers which they used as references. Seb was not the only cool touch deep fryer that was available. Now, to turn back to the issue of whether or not Grokster actually found that willful blindness. Ginsburg-Miller Before you pass that question, then why, out of the six or seven, did they pick the Seb fryer to reverse engineer? They reverse engineered all of them, Your Honor. They reverse engineered all of them. If you look at. Ginsburg-Miller And then they copied the design of the SEB. Actually, Your Honor, they improved it. There's functional features that went beyond and were better than what were in the Seb product. For example, they used better metal to make the cast iron pan. They put the. Ginsburg-Miller But there was a finding that it was an infringement, that the Pentalpha fryer infringed the SEB product. Gershengorn The jury did find that, Your Honor. Kagan Mr. Dunnegan, could I take you to the standard? Because in Arrow 2, we said that the appropriate standard in subsection C was actual knowledge. Why shouldn't we just say it's the same, whether it's B or C, these are just two means of doing a contributory infringement? And the knowledge willful blindness standard, once we've said it applies to C, it applies to B as well. Dunnegan The reason that you shouldn't take the standard from C is because C deals with non-staples and B deals with staples. Someone can be liable under B if they sell a staple article of commerce. When they can't be liable under C, even if they meet the higher standard, even if they meet the state of mind element under C, which is knowing the patent and knowing that the combination would be an infringement. Therefore, to make sure that B does not swallow C, it's very important that B have a higher state of mind. Kagan No. B and C have different standards as to not the knowledge of the patent, but what the person is, the acts that constitute infringement. But that's a different thing from whether they should have different standards as to the knowledge of the patent. Dunnegan Well, when you say there's different standards, the sale of a staple article under B in itself, with a proper state of mind, can be an inducement. The sale of a non-staple article with certain additional conditions can be a violation of C. The action element for B and C is essentially the same for the sale of components. And it wouldn't make any sense to raise it for B, because all you would be doing in that situation is encompassing sellers that were helping their customers do business more effectively, and you wouldn't be getting any more bad guys. The purpose of B is let's get the morally culpable actors. Now. Kennedy I had thought that you wanted us to take the knowing standard in C and apply it to B. Dunnegan No, Your Honor. Kennedy Correct me if I'm wrong. Scalia No, more than that. Dunnegan I would think you have to go with the Grokster standard, Your Honor. The reason for that is, one, in Grokster you found what the state of mind standard was for inducing infringement under B, and you moved that into the copyright law. Then under the other law, there was no question as to whether they knew that the things were copyrighted. Dunnegan That was conceded in that case, Your Honor. Yes. Kagan So why is Grokster relevant here? They conceded the very thing that we're arguing over. Dunnegan Well, it's relevant because it deals with the standard, what is the state of mind element for inducing copyright infringement? Kennedy And you say it's purposeful and culpable. Dunnegan Yes. Roberts How is that different from knowing? My impression was the same as Justice Kennedy's. I thought you wanted the knowing standard. Dunnegan No. The way I understand knowing, Your Honor, is that in Sony, for example, there was no liability, even though Sony knew that some people were going to use the VCR to infringe copyrighted works. That was collateral damage, even though they knew it wasn't the basis for liability. In Grokster, the basis for liability was, even though the defendant knew that there were going to be some infringements, it couldn't be liable for contributory copyright infringement, the equivalent of 271C, because there were substantial non-infringing uses for the Grokster software. Grokster was allowed to be found liable because the defendants had a culpable objective, they had a culpable purpose, or at least a jury could so find, that they wanted to encourage infringement. Sotomayor I'm a little confused. If you knew that there was a patent under B and you still gave the friar, patented friar that you know is a patented friar, to Montgomery Ward or some bean to sell, you're not liable under B because why? What act of yours was not purposeful? Dunnegan Your Honor, I believe the first sentence of your question was if you knew that there was a patent. Is that a hypothetical? Sotomayor Yes. Dunnegan Okay. If we knew that there was a patent and we knew the claims of the patent and we read them and we. Sotomayor Well, we'll go as to, let's just stop. Justice Kennedy and I believe the Chief have asked you, isn't your entire argument that we should move the knowing knowledge of C into B? And you said no. Dunnegan No, because it should be higher. It should be the Grokster standard of purposeful culpable conduct. And the reason for that. Sotomayor Well, then explain to me what's not purposeful or knowing, what's not purposeful culpable conduct. If you know there's a patent or we can decide whether knowledge includes willful blindness or not, that's not my issue. If you know there's a patent and you give the product to someone else to sell, how can you not be culpable or? Dunnegan Because, Your Honor, you could or you could not be, depending on what your purpose is with respect to infringement. If you had a legal opinion which told you that the sale of that product would not infringe the patent, then you wouldn't have a purposeful infringement. Sotomayor So you're introducing a mistake of law defense to knowledge. You're saying, I really didn't know that it was unlawful. I knew there was a patent, but I really thought that it wasn't a legal patent, so I was going to violate what I know wasn't legal. Is that what you're saying? Dunnegan Not exactly, Your Honor, because if you're reaching the conclusion that the product is not within the scope of the claims of the patent, I don't think that's law. That's fact. The reason it's not law is that it couldn't be repealed. It's you can't pass a law abrogating a patent. Sotomayor So you're talking about Sotomayor Why don't you get off the hook for making a mistake of law?  What we have here is a mistake of fact concerning the scope of the claim of the patent. Now, granted, under Markov Sotomayor You would never have any patents enforced under your theory. Dunnegan Yes, we would, Your Honor. Let's take the situation that there was a prior adjudication that the direct infringer was directly infringing. Let's take the situation where there's going to be advertising which references the patent, as there was in Grokster, and says go infringe it. Let's take the situation where there's internal documents at the company suggesting that there is a purpose to infringe, as there was in Grokster. Roberts I'm sorry, I don't want to interfere with your time. Dunnegan No, Your Honor, I want to, please. If the Court has no further questions, I would like to reserve my time. Roberts Thank you, counsel. Mr. Cruz. Cruz Mr. Chief Justice, and may it please the Court. Whatever test that this Court adopts for inducing infringement, the central objective of that test will be to separate culpable bad actors from innocent corporate behavior actors. And by any measure, Pentalpha in this case was a culpable bad actor. In fact, we've got really extraordinary testimony in this case. Kagan So would you have any objection to an actual knowledge rule for blindness standard? That would be all right with you? Cruz I think that is one of multiple standards this Court could adopt. If this Court were to adopt actual knowledge, I don't think actual knowledge is in the statute, but if this Court were to adopt actual knowledge and conclude also that willful blindness is a long recognized means of demonstrating actual knowledge, that would support the judgment. Kagan I take it that we would do that on the basis of Arrow, too. We would just say that's the standard for C and that should be the standard for B. Cruz Respectfully, Justice Kagan, I don't think that would be an interpretation that is faithful to the text of 271. There is an enormous difference between 271C and 271B. 271C includes the word knowing. 271B does not include the word knowing. And your question assumes essentially that Kagan Well, 271C includes the word knowing. You have to know that an item has no non-infringing uses. That's a different kind of knowledge than the knowledge that we're talking about here. Respectfully, in Arrow, too, what the Court did, and it was, as you know, a splintered majority in Arrow, too, where the dissenters flipped back and forth, but with the particular paragraph that addressed the holding on what had to be demonstrated, the Court concluded that that word knowing effectively modified both the knowledge that the non-staple article had no non-infringing use and that it would cause the infringement. That's how the Court read knowing as modifying everything that follows it in 271C. And that it would cause the infringement, but not necessarily that there was a patent, not necessarily the legal effect as opposed to the act. Well, that's necessarily part of what the Court held in 271C. And I would agree this would be a very, very different case if 271B had the word knowing. I mean, Arrow in many ways was a much easier case. If the question is do you have to demonstrate that something's knowing and the statute says it must be knowing, that's much easier. Breyer, I would say I'm not certain that willful blindness would support the conclusion below the standard. The district court or the trial court said really negligence, as I read. It should have known. The circuit said deliberate disregard of a known risk. Well, how much of a risk? I mean, in the business world there's always a risk, and we're talking about a complicated world, probably quite a lot of risk. And so I think that standard would create a great deal of uncertainty. Willful blindness has a tradition. So are you okay with willful blindness? And we say we're afraid they didn't do it, i.e., we're afraid we don't know what they really meant here, and so send it back and do it again? I'm sure you wouldn't be overjoyed, but do you think that would be a reasonable result? I think if the conclusion were send it back and do it again, I don't think that would be a reasonable result. Breyer, what are you supposed to say, known risk? Sure, he says he looked at five, and he said anybody could figure this thing out. All you do is put some little gizmos between the two sides, you know, and you have an inside and an outside, and you just suspend the inside with some little bars of some kind, I don't know what, chewing gum or something. And he says anybody could figure that out. It couldn't possibly be patented. And so that's their view. Parody. But how much of a risk? They'll say, ah, little risk, big risk. So you see why I think we should send it back? Now you tell me why that isn't right. That's what they argue to the jury. And that didn't do it. I'm not saying they're right in that. I bet they'd lose. I mean, but my problem is, do I accept the words deliberate disregard of a known risk, or do I say the more traditional accompaniment to knowledge is willful blindness, which for all its obscurity at least has a history? The jury heard those arguments. The jury rejected those arguments. The argument that was presented to the jury, although the precise words willful blindness were not used, the argument that was presented to the jury was a willful blindness argument. But what was that – how was the jury instructed? What the jury was instructed was several things. And the jury instructions at R.A. 26 and 27. The jury instruction that was used, by the way, was the model jury instruction that has been used since 1998, has been unchanged, and has included largely this language since 1998 over and over and over again. That's the jury instruction we're dealing with. And what – I'm still waiting to hear what it was. It's a complicated instruction, so part of what –  Well, I thought there was some question about that it was so low that it, in effect, amounted to a negligence standard. That is – that is part of the argument Pent Alpha presents. I don't believe that is accurate. Number one, the jury was instructed that plaintiff had to prove by preponderance of evidence that defendants actively and knowingly aided in abetting the direct infringement. That's part of the instruction, that they actively and knowingly. Where are you reading from, Mr. Cruz? RA 26 and 27. It's the end of the red brief. I don't think that's the part they're complaining about. It's in the red brief, the Respondent's brief, that's Respondent's appendant, page 26. Toward the bottom, it says, if you find that someone – and I have a problem that I don't know that they preserve this objection, but let's talk about what the standard ought to be. At the bottom, it says, if you find that someone has directly infringed the patent, and that the defendants knew or should have known that its actions would induce direct infringement. So this means to me that in order to be liable for an inducement, you can be liable if you knew or should have known. Now, if we can just discuss this for a moment, it seems to me that this is the important point in the case, because if you, say, should have known, then you have a standard that's less than intentional for inducers. And that means that every supplier, every business person that takes a product from a manufacturer has the duty to inquire and to find out if there's a patent. And it's a standard that's less than intentional, and that is a very substantial change or a very substantial burden to impose on those who are selling and distributing products. Justice Kennedy, I don't believe that's correct. Number one, we're certainly not advocating a general burden on all producers to do a patent search. That is not remotely the position. But if you say should have known, that is the necessary consequence of the holding. What I would suggest the import of that language is, is to allow constructive knowledge, is to allow essentially willful blindness, which was the entire way it was argued to the jury. Kennedy, as you say, willful blindness was never used, really, until this Court. And this Court has never, in a full opinion for the Court, adopted it even in the criminal context. Can we talk about knowing as opposed to should have known? The argument that was presented to the jury in closing what it's what trial counsel said, and this is the trial transcript, page 929 through 31, which is not in one of the appendixes in front of you, I apologize for that, but what the transcript says is that Mr. Sham, the CEO, never told his patent lawyer, look, what we're doing is copying this SEB product. What he did, I suggest to you, is he set Mr. Levy up to fail. He set him up to fail by not telling him he had copied the product. That was the theory that was argued as to why they should have known, because this was, in effect, a sham, that not telling the lawyer about the product. It wasn't an accident. Kennedy, we are not proposing that we should write an opinion that says no or should have known is the standard for an inducer. And I question whether that is a wise interpretation and a necessary interpretation of B, especially as we're informed through C as to what B might mean. Justice Kennedy, we are not proposing that. And I would say two things. Number one, there is an entire instruction on inducement, and there is also the language I read before that is part of the jury charge on inducement, and I don't think the jury can be presumed to have only listened to one snippet of the instruction without the entire instruction. Kennedy, I beg your pardon. Kennedy, if we're arguing about whether or not you can protect your judgment based upon all that's in the record, I think you may have a strong point. But I'm interested in what the standard ought to be. I'd like you to know what a properly instructed jury should be told with reference to knowledge or something less than knowledge. I would suggest with respect to the language new or should have known that if there is not an actual knowledge requirement, which in my judgment is nowhere in the statute, then you have to have something like should have known. Because I don't know what you alternatively instruct. If it's not actual knowledge, then there is a situation where someone is allowed to have constructive knowledge. Kennedy, so you're saying that B should have a lesser standard of culpability than C? Absolutely. I don't think the statute makes any sense unless B is understood to have a lesser standard. Otherwise, the inclusion of the word knowing is given no effect. Breyer, the difference, they say, between B and C is that C applies to a person who makes some really special thing. You know, it looks like a Japanese kabuki theater costume, and it's actually made out of metal, and it's really has a very bizarre thing. And its only use, a good use, is to do this infringing thing. But B can apply to somebody who makes plastic sheets. B can apply to anybody who makes anything. Is that right? Justice Breyer, under that argument, the statute would be interpreted identically if the word knowing were added to B. And given that they added it to C and not to B. Breyer, the argument is that the words actively induce are meant to be something greater than knowing, not something less than knowing, because otherwise you're going to hold Aluminum Company of America, if that still exists, liable when it makes these aluminum sheets, because somebody uses an aluminum sheet, apparently with et cetera. You see the problem. And that's quite different when you make this weird kabuki-looking thing that only has one use. And that's why it should be harder to hold that person to contributory infringement, not easier. Now, that's their argument. What do you say? Justice Breyer, that may be a reasonable policy argument. However, that is also a reasonable policy argument for modifying A, because right now the aluminum company is liable under strict liability for direct infringement today. But I'd like to get really an answer from you on Justice Kennedy's question, because at the moment I'm not worried about your case. You, of course, are. I understand that. But the — I am worried about Alcoa or little backyard maker of clay pots or, I mean, you know, millions and millions of people make things that are used in millions and millions of ways. And I'm worried about what kind of burden we're supposed to impose on them. I see three candidates. One is, you're liable if you should have known. Two is, you're liable if you consciously disregarded a risk, a known risk, that's sort of like a, you know, the model penal code, et cetera, sort of. And third is willful blindness. Is there a fourth? And if there isn't, what do you choose among those three? No, not what you choose. What should we choose? We have suggested three possible standards to be the rule in this case. The first, the Court could choose to adopt the standard that was adopted in Grokster. And we have argued at considerable length that under the standard this Court adopted in Grokster, the plaintiffs — the defendants, rather, would be liable and it would uphold the judgment below. That's the broadest standard the Court could adopt. A more narrow standard the Court could adopt is that at a minimum, willful blindness of the patented issue suffices to allow inducement liability. That's a more narrow standard. It would cover a much narrower universe of conduct. It would exclude much of the conduct both Justice Breyer and Justice Kennedy are suggesting. That's a second way this judgment could be affirmed and a more narrow rule. The most narrow rule we have suggested this Court could adopt is in the limited circumstances when a defendant deliberately copies another commercial product. At a minimum, that defendant has an obligation to ascertain if that specific product has protected U.S. intellectual property, that it's a very minor obligation that is triggered only when you take a commercial product on the marketplace, reverse engineer it, and copy it, because it's a situation that is highly likely to be indicative of bad conduct, to be risking a very substantial infringement of someone else's IP, and in terms of a low-cost avoider, one of the things that footnote 20 of our briefs. Scalia, before you go further, what if you do that, okay, and you get an opinion from a lawyer, as they did here, said you're not violating any copyright or any patent? If they had said three words differently, this would be a very, very different case. If they had simply, in talking to their lawyer, said, we copied SEB. Scalia, you have to tell the searcher that you copied. That's part of the test. Yes. If you specifically copy a product, you have to look to see if that particular product is protected by IP. So is that another standard? Maybe that's an example of what it is to be willfully blind. If, in fact, you go out and copy something that could well be patented, and you don't tell your lawyer, go look up this one, that's willfully blind. And that's why you say they're the same. I don't want to put words in your mouth. Well, the Court could certainly craft the rule, at least narrowly tailored to the facts here, which is copying. And look, copying is not a unique problem. It is a serious problem internationally, with U.S. intellectual property being stolen, copied, and marketed. And if Pentalpha were to prevail, if this Court were to conclude, unless you have actual knowledge, you know to 100 percent certainty this violates Patent 312, you're immune from liability, that decision of this Court would serve as a road map. You're not immune from liability for direct infringement. You're immune from liability, under the hypothetical, for actively inducing. And that's where there's a very substantial policy difference. But, Justice Kennedy, the reason in this case why we brought a cause of action for both direct infringement and active inducing is because the argument of Pentalpha was their conduct was all overseas, and so they weren't covered by 271A. The entire reason for the inducing strategy is they may well prevail in another case on saying, we stole your property overseas, so you can't get us for direct infringement. And in that instance, inducing is the only way to get the actual mastermind. I mean, that was one of the phrases Giles Rich used in defense of 271. So are you saying that the standard of knowledge should be the same for direct infringement as for active inducement? I think there is a reasonable statutory argument to be made that it is the same, namely that it's strict liability. We are not pressing that as the only way to prevail, but I think there is certainly a reasonable statutory. Roberts. I'm a little confused about the relationship between knowledge and the Grotzker standard. You think knowledge is a more favorable standard for Petitioner than Grotzker. You're willing to accept Grotzker, but not willing to accept actual knowledge. I do, and I'll tell you why. Well, before you tell me why, do you understand — it's unfair to ask you, I guess — but I understood Petitioner to take the opposite position, that Grotzker was a more favorable standard for him than actual knowledge. I agree with you that's what Petitioner said here. My understanding of Petitioner's position was the same as yours, Mr. Chief Justice, and Justice Kennedy's, that they are effectively requiring actual knowledge. That's what they're urging. Mr. Cruz, why aren't you both wrong, that Grotzker didn't deal with the question that we're dealing with, which was knowledge of a patent or knowledge of copyright, that Grotzker dealt with whether there was specific intent or whether there needed to be specific intent to encourage infringing acts. That's what Grotzker was about, an entirely separate question. Let me answer both your question, Justice Kagan, and the Chief Justice's question together. Grotzker used language about purposeful culpable conduct, but it went further. It specified how you ascertain whether that standard is met. And it said, as shown by other affirmative acts to encourage inducement. Now, in Grotzker, part of the argument Grotzker made was, we don't know what copyrights are going to be violated, we don't know what's going to be violated. They made the same argument Pentalpha is making. We have no idea of any specific copyright that will ever be infringed. They argued, we don't have actual knowledge of the specific copyrights. And this Court said, that doesn't matter. Well, one of the briefs, one of the amicus briefs in this case points out that that argument is a lot less plausible in copyright than it is in patents. It's very easy to find out whether you're infringing a copyright. It's very difficult to find out whether you're infringing a patent, especially in the modern age of warehoused patents. I'm not sure that we want to use the same test for copyrights that we use for patents. That policy differential, there may well be differences between patent law and copyright law that are implicated in other cases. Here what occurred is an entire commercial product was copied. It's much more akin to copyright infringement, where the entire product was copied and they just changed the cosmetic feature. Well, that's fine. I'm just expressing reservations about your suggestion that we simply take Grokster wholesale and apply it to this situation. Let me be clear, Justice Scalia. I am not advocating this Court do so. What I am saying is if this Court were to apply the Grokster test, we believe we prevail under it. And in fact, any comparison of Grokster to Pentalpha, Pentalpha is clearly the more culpable actor. In Grokster, the individuals violating the copyrights were the ones who made the choice to directly and deliberately violate the copyrights, and Grokster simply provided the tool to do so. Here, the only bad actor was Pentalpha. Sunbeam, Montgomery Ward, they had no idea of the infringement. Pentalpha was the mastermind behind the entire patent violation, and in fact, because of its actions procuring a right-to-use opinion by keeping the relevant information from its patent lawyer, it lured, it induced Sunbeam and Montgomery Ward and Fingerhut into committing the bad acts. Kennedy, I think you disagree with this in this case, but would you say that there is a reasonable argument in our precedent for saying that the standard of knowledge under B should be greater than reckless disregard? I do not believe there is in the precedent. For one thing, reckless disregard is the standard now. Willfulness and recklessness are the standard right now for enhanced damages and attorney's fees. And if it were the case that every violation of 271B required recklessness or willfulness, it would also mean that every violation would qualify for enhanced damages or attorney's fees. I don't think that's consistent with the statutory standard. That's not the language Congress adopts. All right. Would you say that there is substantial authority for the proposition that it should be, the state of mind, should be greater than should have known? I do not believe there is. Particularly how should have known was used in this case. A, the jury was the way the jury was instructed, I would suggest it was effectively a constructive knowledge instruction. If you look at the other We're dealing with a Federal Circuit decision. We're reviewing that decision. The Federal Circuit had a formula. It said, standard is deliberate disregard of a known risk. One thing we will surely do is to say whether that standard is right or wrong. So the Federal Circuit, whatever the jury found, Federal Circuit said the law is that you are liable under 271B if you are deliberately, if you deliberately disregard a known risk. Is that standard the right one? I agree the Federal Circuit had that language, and I would not suggest that standard was the wrong standard. But what I would say what the Federal Circuit in fact did is it applied willful blindness. If you look at the cases it cited, if you look at how it in fact interpreted it, although it used the deliberate indifference language, which I will concede was somewhat confusing in its reasoning, if you look at it, it framed it as whether Pent Alpha had constructive knowledge of the patent. And it then cited willful blindness cases from other circuits that focused it on actively disregarding a known risk and deliberate avoidance and consciously avoided knowledge. All of that is willful blindness. Alito, Mr. Cruz, well, we are certainly interested in what the standard should be, but in terms of the disposition of this case, maybe you can help me with this. The instruction to which there was an objection on 124A to, well, wherever it is in the joint appendix, was the newer should have known, right? Cruz, and the objection that I see was that the words, or should have known that their actions, this is 135A of the joint appendix, should have been stricken. So am I right that the only issue that is preserved is the question whether actual knowledge was required? Because that was the only, that was what, that was the error, the alleged error that was identified by Mr. Dunnegan. Cruz, I agree with you. If it's wrong on that, then the judgment should be affirmed. I agree with that entirely, and indeed, we have suggested the central issue, the question before this Court is, is there a requirement of actual knowledge of the specific patent? And in my judgment, there is no reasonable argument from the statutory language that in order to be liable under 271B, you must specifically know to 100 percent certainty this is violating patent number 312. That's the issue they objected. That's the issue that has been brought before this Court, is. Sotomayor, because we still have to define knowledge. If we accept that actual knowledge can have a different definition, just not the should have known definition, won't we have to define what knowledge, what kind of knowledge we're talking about? If it is a case that you must specifically know of the specific patent, it will ensure that the scrupulousness of the statute is not violated. Sotomayor, I agree with you. We can say that, but how does it help the development of law for us to simply say it's not so much knowledge that you have to know the specific patent by number? I'm going to suggest it's a binary choice. It is either actual specific knowledge of the patent, or it is some form of should have known that allows constructive knowledge. Breyer, that's where I am at the moment. The should have known or the willful blindness, the disregard. The problem, and it seems like a real problem there, is know what exactly? Well, know there's a risk. Well, at that point, half the country in the business world is very upset because there's always a risk. And the other problem is you say if you move away from that and say no, no, I mean a real risk, I mean a huge risk, I mean a risk that, in fact, you almost knew that this was it. Now, I can do it with my tone of voice, but I need the words to put in there that are going to calm people's fears that they're not suddenly going to be held liable because there's some fairly small risk of this. So what words would you use? In this case, you had unusual. I know this case I'm not worried about. I'm worried about what I said. Well, let me suggest what words you could use to resolve this case, because I don't want to just resolve the case. The reason we took the case is because there seem a bunch of standards floating around. Now, I know our interests differ in this matter, but I would appreciate any help you can give me about what I'm thinking now is words that will quantify the risk that you have to have known about, a risk, so that it doesn't look like some small thing that's always there, but looks like some giant thing that's pretty close back to you. The language that was used in Santos was that willful blindness is when a party aware of a high probability of a fact deliberately avoids learning. Breyer, what about that? That language would encompass this case, and it would not bring in innocent actors. That wouldn't be my problem. You say a high probability of that. You have to be you have to consciously, that's the Model-Penal Code, that's the Torts Mott restatement, you have to consciously disregard a high probability that this item was patented and also meet the other requirements that are part of active inducement. Is that that's what your thought is? I think that would be an acceptable test this Court could. A high probability of what? A high probability that you will infringe this patent, no, any patent. With respect to what was happening here, when you copy a commercial product, there is a high probability that product is protected by a patent. And when you engage in what the district court characterized as a general test, what I would suggest, and that's one of the reasons we proffered the narrow test that is keyed on copying, because copying of completed commercial products is the most egregious.  That narrow rule is the most narrow rule. If I could briefly suggest. Sotomayor, what do you think the rule should be to articulate what Justice Breyer was asking? With respect, my client doesn't care, as long as the result at the end of the opinion is preferred. I know your client doesn't care, but still we have to write. So what about to follow it up a little bit, it is knowledge. You are familiar with these areas, so you are helpful. And it's a knowledge, or a known, or consciously disregarding a known risk, where the risk consists of a high probability that that item that you are inducing to be produced will infringe a patent. I agree that would suffice. With respect to why this Court should not remand, if I may very briefly make three points. Number one, this case has been going on for 12 years. To remand for a new trial would drag it on to more endless litigation for no purpose. The district court observed below this case was not a close case. It took the jury 109 minutes to resolve against Pentalpha on every single ground that was presented to it. Number two, the jury charge that was sent to the jury was more than sufficient under any of these standards. But number three, the alternative argument we made, there was a finding of direct infringement. That finding of direct infringement is also supported by the damage award, and that's an alternative ground to remand it. Now, in the reply brief, Pentalpha says, focuses on the same differential that the Federal Circuit did between the language of the jury charge and the language of the verdict form. But the only evidence the jury had of the number of units sold by anybody was the stipulation. In their reply brief, they say, well, there could have been some sold in Canada. That was lawyer argument. The only evidence which everyone agreed was the stipulation, and if that's true, that supports the damage award. Roberts. Thank you, Mr. Cruz. Mr. Dunnegan, you have 4 minutes remaining. Five points in rebuttal, I believe, Your Honor. The first is, what should the standard be with respect to willful blindness? And I do want to call the Court's attention to one sentence in Grokster, appearing at page 941 of the opinion. And it provides, this is worth reading, I believe. If liability for inducing infringement is ultimately found, it will not be on the basis of presuming or imputing liability, excuse me, fault, but from inferring a patently illegal objective from statements and actions, showing what that objective was. Now, in the context of an amicus brief from the Solicitor General in that case, suggesting a willful blindness standard, it seems to me that that language is a rejection of imputing a willful blindness standard. So you want actual knowledge of the patent. That's your test? The test that we're looking for, the Grokster test, is there purposeful culpable conduct? Alito, do you want actual knowledge of the patent? Yes, Your Honor. And that's the issue you preserved with your objection? Not precisely. We preserved other issues beyond that. We preserved both the jury charge by objecting it, 135A of the Joint Appendix, and we objected to the judgment as a matter of law motion by making it and saying specifically there's no evidence here that there was actual knowledge of the patent before April 9th of 1998. Now. And after that date, you admit you're going to continue to sell the product to the retailers. Yes, Your Honor. So after something ensued, then you are actively inducing infringement. No, Your Honor. At that point, we have actual knowledge of the patent, and the analysis has to go to what was our purpose. For the bulk of that period of time, we had a legal opinion from a very competent New York City lawyer stating that we did not infringe. And the jury, I guess the second point I was trying to make is, the jury never evaluated any standard higher than new original. I thought that opinion was after the first finding of infringement, and then you redesigned the product, and that the letter that you got dealt with the redesigned product. I believe your timing is correct, Your Honor. The So, but after, just originally, Sunbeam ensued for infringement. Sunbeam notifies Pentalpha. At that point, Pentalpha is continuing to make sales. Is it infringing? Is it actively inducing infringement? That's a question of fact, Your Honor. The jury resolved it against us. But the point I was trying to make is that for some period of time after that, we had a legal opinion saying we didn't infringe, and we believe that legal opinion from the New York City attorney would prevent or should prevent, as a matter of fact, a finding of purposeful culpable conduct. Now, the second standard I wanted to address was. Ginsburg. But you admitted there was purposeful culpable conduct when you didn't, when you had the original design, and that was, and you were sued for actively inducing infringement of that design, by that design. No, no, Your Honor. We would never concede that we were purposefully. But you think a jury could have found that from the facts? Yes. We're not seeking judgment as a matter of law for any claims that arose after April 9th of 1998, when we had actual knowledge of the patent, only before we had actual knowledge of the patent are we seeking judgment as a matter of law. Now, going to the issue of whether willful blindness could be found by the failure of someone to tell the patent attorney that there was a copy of. I'm sorry. Why are you doing that? I thought that you came in arguing that the actual, you have to have actual knowledge of the patent. Yes, Your Honor. By number and, that was the conversation we had earlier, and that the patent covered the scope of your invention. Yes, Your Honor. That's our primary argument. But if the Court were to adopt willful blindness as being enough, then I would question whether or not simply not telling the patent attorney what references were used or even which ones were copied would be enough, because in that situation the company has taken an effort to find out what the truth is, and it simply failed to meet the gold standard in meeting that obligation. Thank you, counsel. The case is submitted. Thank you.